From: Walter G. Anderson #1092654
Eastham Unit 2665 Prison Rd. #1
Lovelady tx. 75851

Re: Letter Brief to the Court, En Banc.

Dear Clerk,                                      8-31-2016
        Enclosed is a 4 page letter Brief

to the Justices that govern this honorable Court.

Being a prisoner I have no means to make copies

For the indevidual justices. this matter has Been

on going For 15 years And I have Been Stalled

in the Fed. Courts due to State actions Beyond

my control. All I want is a Fair Review and

OR permission to Return to Fannin County in a

State 11.07 that was, through thier actions, denied

me illegaly OR unconstitutionaly. Please present

the Following to the judges of this Court For

me. thank you        Respectfuly    Walter

PRO se

Certificate of Service

I Walter G. Anderson do Swear under Penalty of Perjury that the Forgoing is true and that this Brief and its Appendixes were placed into the prison mail System on aug. 31, 2016. Eastham unit love lady tx. to: the Court of Criminal Appeals of Texas P.O. Box 12308 Capital Station Austin TX. 78711.

Respectfully Submitted

Walter G Anderson
Eastham unit
love lady tx
pro Se 8-31-16

RECEIVED IN
COURT OF CRIMINAL APPEALS

SEP 19 2016

Abel Acosta, Clerk

Cause No. 20118

Table of Contence
to Letter Brief.

Letter Brief to the Texas Court of Criminal
Appeals En Banc    (4 Pages)    Pg. 1

Appendex A
Mandate By tex court crim App. (2 Pages)

Appendex B
General Denial (improperly suspending state Habeas corpus)
(2 Pages)

Appendex C
Certificate By District Clerk proving Dates and non
Conformaty.    (1 Page)

Appendex D
Evidentiary hearing transcripts From Fannin County
showing Brady violation improper Court Room tactics
And manipulating system (successive use of writ Rule)
to denie Relief.
    (62 Pages)

LETTER BRIEF TO THE

TEXAS COURT OF CRIMINAL APPEALS

EN BANC

TR. CT. NO. 20118

To the Honorable Judges of the Texas Court of Criminal Appeals. I have been convicted of a crime I did not do. There is more evidence to support the facts that there was no crime committed at all. After two trials I was convicted by a prosecutor, Bill Ray Gant, who was allowed by the State Court to use unethical tactics to create an unfair, unconstitutional trial.

I come before this, the highest State Court in Texas, to grieve the following: It is my right, according to the First Amendment to the United States Constitution to have my grievance heard. The record will reflect the following:

In March of 2002, a one day trial was held where the State Court allowed Assistant District Attorney Billy Ray Gant to completely side step Discovery and Texas Rules of Evidence to create a trial so prejudicially unfair as to render it completely Unconstitutional. 6th Amendment right to impartial jury (Fair trial). 14th Amendment Equal Protection of law, and Due Process.

In December 2003, the 6th District Court of Criminal Appeals, Texarkana, affirmed the conviction via a Direct Appeal that attacked <u>none</u> of the trial errors preserved by trial attorney, Donnie Jarvis Jr. of Sherman, Texas. This attorney was court appointed for trial <u>and</u> the Direct Appeal by the convicting court. Attorney for the Direct

1

Appeal has a duty to inform his client of it being affirmed by the Court of Criminal Appeals, yet he did not. It was a blatant prejudicial act hiding the fact that he deliberately hid certain facts from the higher court that would have reversed this conviction.

A State Habeas Corpus was filed. The common man's only Writ of Right to grieve the issues of an unlawful conviction to, first, the convicting court then the Texas Court of Criminal Appeals, my right to "Petition the Government for Redress of Grievances" is protected in the United States Constitution Amendment number one, Article I section 9 of the United States Constitution clearly states, "The privilege of the writ of Habeas Corpus shall not be suspended." Yet my first Habeas Corpus was suspended and then rendered ineffective by the convicting court. It was literally removed from the Appellate process altogether. With no accountability by this court or any other. Later, after discovering impeachment evidence that was deliberately withheld by the prosecution during trial, a State Evidentiary hearing was held proving a gross miscarriage of justice. But I was denied relief due to the State Courts determination that the first Habeas Corpus petition was the place to address the issues presented, "No second bite at the apple." Yet the first Habeas was never heard! Even after this very court ordered Fannin County to process this writ, they refused. Until a general denial was issued by the very entity of the judicial system that railroaded me in trial. No State judge acknowledged receipt of the writ. No State judge addressed the same issues that "Should have been presented in petitioners original Habeas." In essence, this State Court was allowed to completely side step any wrongdoing of blatant acts of unethical, unconstitutional behavior by this very court. (See enclosed documents.)

2

I had no effective representation in trial to protect my rights as a United States Citizen. The same ineffective attorney was put in place to protect the State Court of wrongdoing and preserve a conviction that was illegal, prejudicial and unconstitutional. I had NO effective Direct Appeal. No petition for Discretionary Review and no State Habeas Corpus. The papers were filled out and filed, but no State Post Conviction Review to insure conformity in the judicial process that governs our society.

The Federal Courts use this against me to deny me relief. Just like Fannin County used their own mishandling of the first State Habeas Corpus to deny the second. This is Texas justice? What is the purpose of this court if not to fix what needs fixing? How many others have been subject to this kind of judicial treatment? When will somebody do something about it?


## PRAYER


My hope is that, as a United States Citizen under two Constitutions that forbid this kind of treatment, the Texas Constitution and the United States Constitution, this Honorable Court, who holds Jurisdiction over this matter, will appoint a Court of Inquiry, in the interest of justice, to look and see what I say is true. Ask Questions. Protect my Rights! Please give me due process! Start with the trial and ask Attorney Donnie Jarvis Jr. of Sherman, Texas, Why he didn't address Blatant recorded trial errors in the Direct Appeal? Ask him why he failed to notify me of its being affirmed, robbing me of a P.D.R. Ask the County Judge why she failed to acknowledge petitioners First Habeas Corpus and why she, (Judge Laurine Blake) ignored an order by this very court. Ask

3

why I did not get proper protection under the law and due process as prescribed in the 14th Amendment to the United States Constitution.

Recently I filed a motion for Leave to file an Out of Time Petition for Discretionary Review citing ex-parte Wilson and ex-parte Jarrett, but was denied. There was no reason given. An Out of Time P.D.R. is proper to rectify attorney error. It would also allow me to prove everything in this letter brief as it is all a matter of record.

My Direct Appeal and the handling of the first Habeas Corpus is so prejudicial it is the very definition of Obstruction of Justice. To do nothing is the very definition of Tyranny. I've been trying to get a review for fifteen (15) years! Just take a look. PLEASE!

Thank You.

Respectfully Submitted,

Walter G. Anderson #1092654

Eastham Unit, Lovelady, Texas

Post Script. Perhaps An alternative Remedy would be to grant me permission to go Back to Fannin County On another State 11.07 OR Allow Fannin County jurisdiction to Rule on a previously held Evidentuary hearing. (See Enclosed.)



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## WR-61,082-01

### WALTER G. ANDERSON, Relator

v.

### DISTRICT CLERK OF FANNIN COUNTY, Respondent

## ON APPLICATION FOR A WRIT OF MANDAMUS
## FROM FANNIN COUNTY

*Per Curiam.*

### ORDER

This is an original application for writ of mandamus. Relator contends that he has sent an application for writ of habeas corpus to the District Clerk of Fannin County and that more than 35 days have passed without the writ either being filed or forwarded to this Court. There is no record of the habeas corpus application having been filed in this Court, and no record of a timely filed Order Designating Issues.

It is this Court's opinion that additional information is required before a decision can be

Appendex A
Pg 1

12

**Scanned Dec 14, 2010**



reached on the motion for leave to file the instant action. The Respondent, District Clerk of Fannin County, is ordered to file with this Court within thirty days a response by submitting on the record such habeas corpus application, a copy of a timely filed order designating issues to be investigated, *see Martin v. Hamlin*, 25 S.W.3d 718 (Tex. Crim. App. 2000), or by stating the nature of any applications filed by Relator such that they are not filed pursuant to TEX. CODE CRIM. PROC. art. 11.07, § 3, or that no applications by Relator have been filed. This application for writ of mandamus is held in abeyance pending compliance with this order.

DELIVERED:     March 2, 2005
DO NOT PUBLISH

APPendix A
Pg 2

4/4

13

Scanned Dec 14, 2010

NO. 20118-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 336TH JUDICIAL DISTRICT |
| | § | |
| WALTER G. ANDERSON | § | FANNIN COUNTY, TEXAS |

## THE STATE OF TEXAS ORIGINAL ANSWER
## AND GENERAL DENIAL

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now, The State of Texas in the above entitled and numbered cause, and files this its Original Answer and General Denial herein, and in this connection would respectfully show the Court the following:

### I.

The State of Texas (hereinafter the "State") denies all and singular, each and every allegation contained in Applicant's Application for a Writ of Habeas Corpus Seeking Relief From Final Felony Conviction Under Code of Criminal Procedure, Article 11.07 and demands strict proof thereof.

### II.

Further, the State would show that, as a matter of law, there are no controverted, previously unresolved issues of fact material to the legality of the Applicant's confinement.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, the State prays that Applicant take nothing by reason of this Application for Writ of Habeas Corpus and that it be denied and the State be discharged with its cost.

Appendex B
pg 1

45

Scanned Dec 14, 2010



Respectfully submitted,

Richard E. Glaser
County and District Attorney of Fannin County
State Bar No. 08000000
101 E. Sam Rayburn Drive, Suite 301
Bonham, Texas 75418
Phone (903) 583-7448
Fax (903) 583-7682

Attorney for State of Texas

## CERTIFICATE OF SERVICE

On this the _8th_ day of August, 2005, I mailed a true copy of the above Original Answer and General Denial to Walter C. Anderson, Applicant, by regular mail.

Richard E. Glaser

Appendex B
Pg 1

46

16

**NOTICE THAT WRIT OVERRULED BY OPERATION OF LAW**

CAUSE #20118-A

EX PARTE:          >       IN THE 336TH JUDICIAL DISTRICT

**WALTER GERALD ANDERSON**    >       OF FANNIN COUNTY, TEXAS

**CLERK'S CERTIFICATE UNDER ART. 11.07, SEC. 2(c), V.A.C.C.P.**

This is to certify that the above numbered and entitled Petition for Writ of Habeas Corpus Post-Conviction 11.07 VACCP was filed in this Court on the 8th day of November, 2004, and that a copy of said Petition was served upon the District Attorney's office on the 7th day of July, 2005; that further, as clerk of this court, I hereby certify that no orders have been entered by the trial court within a 35-day limit from the filing of this petition, and that therefore, pursuant to the provision of Art. 11.07, Sec. 2(c), supra, it appears that the trial court's failure to act within the time limits as prescribed by statute constitutes a finding that there are no previously unresolved facts material to the legality of the applicant's confinement, and therefore, it would appear that the application for Writ of Habeas Corpus has been overruled by operation of law.

So certified this 26th day of August, 2005.

NANCY YOUNG,
District Clerk

By _Nancy Young_ Clerk

Appendix C
Pg 12

47

1

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL COURT CAUSE NO. 20118-B

STATE OF TEXAS ) IN THE DISTRICT COURT
)
   Plaintiff, )
)
VS. ) FANNIN COUNTY, TEXAS
)
WALTER GERALD ANDERSON )
)
   Defendant. ) 336TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WRIT OF HABEAS CORPUS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 12th day of November, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Laurine Blake, Judge Presiding, held in Bonham, Fannin County, Texas:

Proceedings reported by stenographic method.

Appendex, III MOTION MOTION
Charla Reamy, CSR, TCRR Appendix D
(903) 583-2863
pgs 1 - 62

2

A P P E A R A N C E S

Mr. James L. Moss
SBOT 24049592
Fannin County Criminal District
Attorney's Office
101 East Sam Rayburn Drive
Bonham, Texas   75418
(903) 583-7448


ATTORNEY FOR THE STATE OF TEXAS

        - AND -


Mr. David K. Haynes
SBOT 09285500
Attorney at Law
2600 W. Eldorado Pkwy. Suite 220
McKinney, Texas   75070
(972) 542-1793


ATTORNEY FOR THE DEFENDANT

3

I N D E X

VOLUME 1

WRIT OF HABEAS CORPUS

Page   Vol.

NOVEMBER 12, 2010

Opening statement by Mr. Haynes............6        1

Opening statement by Mr. Moss.............8         1

DEFENDANT'S WITNESSES
                         Direct       Cross

Donnie Jarvis            11,25         20,26
Darin Barnett            27,39,44      35
Walter Anderson          46            52

Both sides rest and close.................54        1

Closing statement by Mr. Haynes...........55        1

Closing statement by Mr. Moss.............56        1

Court's Ruling............................59         1

Court Reporter's Certificate..............62         1

EXHIBIT INDEX

(None.)

PROCEEDINGS

THE COURT: We're on the record in the State of Texas versus Walter Anderson, Cause Number 20118-B. And, sir, you're Walter Anderson?

THE DEFENDANT: Yes, ma'am.

THE COURT: Let's have you stand and we'll have you be sworn in. If you'll stand and raise your right hand.

(The Defendant was sworn by the Court.)

THE COURT: Okay. You may be seated. Okay. Do we have any witnesses here that the parties would like to have sworn?

MR. MOSS: Yes, Judge.

MR. HAYNES: Mr. Jarvis, Judge.

THE COURT: Okay. We'll have each of you raise your right hand.

(The witnesses were sworn by the Court.)

THE COURT: Okay. If you'll state your name, please.

MR. BARNETT: Gary Barnett.

THE COURT: Say the last one.

MR. BARNETT: Barnett.

THE COURT: Can you spell --

MR. BARNETT: B-a-r-n-e-t-t.

THE COURT: Thank you, sir.

6

MR. JARVIS: Donnie Jarvis, D-o-n-n-i-e J-a-r-v-i-s.

THE COURT: Thank you. Does either side desire to invoke the rule?

MR. HAYNES: We are going to invoke the rule if the Court please.

THE COURT: Okay. The rule's going to be invoked, so, gentlemen, we'll need both of you outside until you're called to testify. Please understand that part of the rule means you cannot discuss your testimony with anyone while you're waiting. Additionally, you may not listen to anyone else's testimony, which includes, nobody can come out and tell you what somebody else is saying. That's why we have you outside the courtroom. Okay? Do y'all have any questions? There are different punishments that could occur including contempt of the court if you don't follow the rules. So, it's serious.

All right. Gentlemen, if you'll please step outside, we will have you called in when it's your turn to testify. Thank you for being here.

(Witnesses exit the courtroom.)

THE COURT: Okay. We will hear the requests of the parties at this time.

MR. HAYNES: Your Honor, this is a --

7

styled as a motion for new trial filed by the defendant, Mr. Anderson, on the ground of newly discovered evidence. Of course, it's filed outside of what the rules provide for for filing a motion for new trial, but the Court, I understand, is treating this matter as a writ of habeas corpus.

We expect that the evidence is going to demonstrate that key information about the State's complaining witness was withheld at the time of trial, and that that prevented the jury from finding out that the complaining witness had an extensive prior criminal record including a conviction for sexual abuse in the -- in Essex County, New York, that occurred on the 13th of April 2000, just a little while before the case was tried. That prevented the defendant's trial counsel from making a vigorous cross-examination of the complaining witness, which, if that had been able to have been done -- the case basically turned on the believability of the complaining witness. I don't think the Court's going to be able to conclude beyond a reasonable doubt that if the jury had heard that about the complaining witness, the verdict would have been the same. And that's what we think the evidence is going to demonstrate to you this afternoon.

8

THE COURT: Thank you, Mr. Haynes.

Okay. Let's hear from the State.

MR. MOSS: Your Honor, initially the State would agree that this case has been filed as a motion for new trial based on newly discovered evidence and that that motion has been filed outside of the statutory guidelines and, as such, should be denied.

Additionally, the State would also ask the Court to take judicial notice of its file. You will see that Mr. Anderson has previously filed a writ of habeas corpus that was addressed by the court of criminal appeals. In that writ of habeas corpus, he complained, among other things, about ineffective assistance at trial and his request for relief was denied.

The State plans to show the Court that back when this case was tried, it was the district attorney's office practice at that time to provide a criminal -- full criminal history of all witnesses that planned to testify. The prosecutor that prosecuted the case filed an affidavit in this court -- Billy Gant -- indicating that he had no specific recollection about the case but that it was the process that the prosecutor's office followed at that

time and that he cannot think of any reason why Mr. Barnett's criminal history would have been withheld.

Additionally, Mr. Gant indicated that he reviewed the record, and Mr. Anderson's trial counsel Donnie Jarvis, in fact, questioned the alleged -- the victim, Mr. Darin Barnett, about his previous conviction, although -- the State will admit -- inartfully. Mr. Barnett -- the State will call Mr. Barnett. Mr. Barnett will indicate that he was, in fact, convicted in the year of 2000 for a sexual offense. It was a felony. He was sentenced to a year in county jail in the State of New York and that he was required to register as a sex offender and he has been registered in the State of Texas since the time he moved here in 2001 when he was released from jail in Essex County, New York.

Mr. Barnett will also -- would also testify that the lawyer for the defendant in that case, Donnie Jarvis, visited with him prior to trial, that they talked about his conviction for a sexually-related matter. Mr. Barnett admitted to him that he was, in fact, a sex offender and required to register. And so, at least at that point when Mr. Jarvis had met with Mr. Barnett, that he was on

notice that Mr. Barnett had some criminal history that needed to be investigated. And Mr. Jarvis will testify that he remembered prosecuting -- or, remembers representing Mr. Anderson. He cannot recall specifically if a criminal history was provided to him or not. He has reviewed the record. He remembers meeting with Mr. Barnett, he remembers talking to him somewhat about his criminal history but he doesn't have any specific recollection, and that he remembers questioning Mr. Barnett on the stand about his criminal conviction.

And then the State would tender to the Court a trial transcript -- I don't know if the Court has it -- of the trial at large.

MR. HAYNES: We certainly don't have any objection to that and we would want the Court to review the entire transcript.

THE COURT: That will be made part of the record.

MR. MOSS: And I would just ask the Court if you had the affidavit of Billy R. Gant. Should be file marked November 10, 2010.

THE COURT: No, I'm not showing that document to be filed. Wait. It looks like it got put in one of the files but not the one I was operating

11

under.

MR. MOSS: Yeah, it won't -- shouldn't be in the writ file. It should be in the trial file. I think that's the confusion.

THE COURT: Yes.

MR. MOSS: The files have been used interchangeably.

THE COURT: Yes. This is in Cause Number 20118, is where the affidavit was located. And that was from Billy Gant. Okay. Anything further?

MR. MOSS: Not at this time, Your Honor.

THE COURT: Okay. Mr. Haynes, you may call your first witness.

MR. HAYNES: We call Donnie Jarvis.

THE COURT: Sir, if you'd come forward and have a seat on the witness stand, please.

Okay. You may proceed.

MR. HAYNES: Thank you, Your Honor.

DONNIE JARVIS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HAYNES:

Q. What's your name, sir?

A. Donnie Jarvis.

Q. What city do you live in, Mr. Jarvis?

12

A.   Sherman, Texas.

Q.   And how long have you lived in Sherman?

A.   All my life basically, except for when I went to law school at Tech.

Q.   All right.  And how old a man are you?

A.   Forty-two.

Q.   And on March 20, 2002, were you a licensed attorney in the state of Texas?

A.   Yes.

Q.   Are you a licensed attorney in the state of Texas now?

A.   Yes.

Q.   Did you represent the defendant in this case, Walter Gerald Anderson -- in this cause now on trial?

A.   Yes.

Q.   Were you hired or were you appointed?

A.   Appointed.

Q.   When were you first appointed?

A.   I do not recall.

Q.   Are you able -- when was the case tried?

A.   I don't remember the exact date.

Q.   If you saw the transcript, would it refresh your memory?

A.   Sure.

MR. HAYNES:  May I approach the witness,

13

Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Haynes) Mr. Jarvis, I'm just going to show you the first page of the first volume of the transcript. When you look at that, can that -- does that refresh your memory about when the trial might have been?

A. Yes.

Q. And when was it?

A. 20th of March, 2002.

Q. All right. So, it was tried in the spring of 2002. How long had you been representing Mr. Anderson before the trial began?

A. Gosh, I don't remember, honestly. I searched for my file and I could not find his file.

Q. All right. Weeks? Months? Days? Do you have any idea?

A. I don't honestly.

Q. No idea at all. All right. Prior to the beginning of the trial, did you confer with the prosecutor?

A. I'm sure I did.

Q. Who was the prosecutor?

A. I want to think that it was Billy Gant.

Q. All right. Did you ask him for what we

14

lawyers call the discovery information about the case?

A. I would think I would have. I can't say for sure, but I would have told -- I think that was a standard court rule --

Q. And did you --

A. -- it be provided.

Q. I'm sorry. I didn't mean to interrupt you. Did you receive discovery information from Mr. Gant?

A. I do not -- I received some discovery, yes.

Q. Okay. Did it -- did you ask Mr. Gant for information about the prior criminal record of any of his witnesses?

A. I don't recall asking that specifically, but that's what I was referring to a moment ago actually. I think there was court rules stating it was supposed to be provided prior to voir dire.

Q. All right. And, in particular, did you ask him about the prior criminal record of his witness, Darin Barnett?

A. I just don't remember if I did or didn't, honestly.

Q. All right.

MR. HAYNES: Approach the witness again, Your Honor?

THE COURT: You may.

15

Q.    (By Mr. Haynes)  All right.  I'm going to direct your attention to page 30 of the trial record and, in particular, your response to a question from the Court at the bottom of the page.  I understand that this trial was eight years ago now.  There's no way you remember verbatim what was said.  But when you look at that document that I pointed out to you, does that refresh your memory about a colloquy between you and the trial court with regard to the information you had been provided about the prior criminal record of the witnesses?

A.    Yes, it does.

Q.    What did you tell the judge at that time?

A.    I told the judge I didn't receive the criminal history prior to the picking of the jury.

Q.    All right.  And understanding you can't remember it now, surely at that time it was very fresh in your mind about whether you had or had not received the information.

A.    True.

Q.    All right.  And you told the Court you hadn't.  Right?

A.    Right.

Q.    And you wouldn't have told the Court you hadn't if you really had?

A.  No, I would not have.

Q.  All right.  And you have looked for your file and you don't have it.  Right?

A.  Agreed.

Q.  So, there's no way to check now to see what was in the file.

A.  True.

Q.  And even if you had the file, it would be hard to say what was there now was there in March of 2002.

A.  Probably a fair statement.

Q.  All right.  If you had known about Mr. Barnett's criminal record, would have you pointed it out to the jury?

A.  Yes.

Q.  You'd agree with me that that would have reflected badly on his credibility?

A.  True.

Q.  Do you know what his criminal record was at that -- as it existed at that time, March 2002?

A.  I've had a chance to look through this and I'd forgotten this part of it, but, if I recall, I asked him some questions in relation to him having some criminal history in New York or something.  If I remember correctly.

Q.   The document before you, just switch over to page 47 and 48.  That's the point at which you're asking him about his prior criminal record in New York; is that correct?

A.   That's correct.

Q.   And you asked him if it was true that he'd been convicted of a sexual assault in New York. Right?

A.   Correct.

Q.   His answer was he had not?

A.   Right.

Q.   And you didn't have documents that would show that he had.

A.   True.

Q.   Because, if you had, you would have shown them to him.  Right?

A.   Agreed.

Q.   All right.  And if you didn't have those documents, it was because the district attorney didn't give them to you.

A.   I agree.

Q.   All right.  And he denied a lot of your questions about his prior criminal record; is that true?

A.   That's true.

18

Q. And you didn't have anything in writing --

A. Agree.

Q. -- to impeach him with.

A. Yes.

Q. Did you obtain any information from any other source -- not the district attorney -- about Mr. Barnett's prior criminal record?

A. I -- I think -- and I'm just going off what I remember because I don't remember for sure that this is correct. I know that I went out there to speak with him where he was working and I want to think that I was -- I talked to maybe another employee there or somebody and got some rumor-information type of thing, which is why I think that this goes on the way it does because I'd heard some rumors that there might be something.

Q. You asked -- you asked Barnett about whether he was a drug user; is that correct?

A. Correct.

Q. Did you have any direct information from Barnett himself that he was a drug user?

A. I don't think he told me directly. I don't know for sure.

Q. Did you ever talk to Barnett, himself, personally before you talked to him on the witness

19

stand?

A.   I know I went out there to talk to him.   I don't remember if I actually got to talk to him.   I don't know if I talked to his boss and/or him.   I honestly don't remember.

Q.   So, whatever you used to cross-examine him with that we see there on page 48 -- 47, 48, 49, around there of the record -- was what you had picked up when you went to his place of employment and talked to him or maybe his coworkers.

A.   Or rumors or something.   I think it came from investigating the case.

Q.   All right.   So -- and, at this point, at this time, that's all you can tell us.   You don't have any documents about it.

A.   I don't.

Q.   Thank you, Mr. Jarvis.

MR. HAYNES:  No further questions.   Pass the witness.

MR. MOSS:  May I approach?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. MOSS:

Q.   Mr. Jarvis, you cannot remember if you went up and spoke to him or not?

20

A. I don't remember for sure. I know that I intended to. Whether I actually got to talk to him, I just don't remember.

Q. Okay. I'm going to direct your attention to page 43, Line 11.

A. Okay.

Q. If you'd just take a look at that.

A. Yeah. Okay.

Q. Okay. So, reading that, does that refresh your memory?

A. It does.

Q. Did you get to go speak with Mr. Barnett in preparing for this trial?

A. I did. Said I talked to him in January of this year.

Q. The case was tried in?

A. March. 2002?

Q. You went and talked to him about two months before trial. Right?

A. (Moves head up and down.) *Is he supposed to speak, not just nod?*

Q. You had at least some information that the victim in this case had been convicted or prosecuted for a sexual offense out of another state. Correct?

A. I had -- I guess I had gleaned some information, yes.

Q.    You knew it was New York.  Right?

A.    I knew that he was from New York.

Q.    Okay.  Did you know that he was registered as a sex offender in the state of Texas in 2002 when the case was tried?

A.    I did not know that.

Q.    Okay.  Did you know that -- did you know in 2002 -- did you have the ability to get on the internet in 2002?

A.    I probably did.

Q.    Okay.  Did you know that in 2002 -- well, since 1996, the State of Texas has been posting those individuals that were required to register in the state of Texas as sex offenders on a website administered by the Texas Department of Public Safety?

A.    Are you asking do I know that now or did I know that then?

Q.    Well, do you know that now?

A.    I do know that now.

Q.    In 2002, were you aware that sex offenders had to register and that DPS was posting that registration online at a database that the public could search?

A.    I don't know that I knew that or not, honestly.  I don't honestly know.

23

common for them to provide that information generally?

Q.    Generally, and then in this specific case, do you think if an issue like that came up, you would expect them to then provide that information?

A.    Well, I would expect it.

Q.    Okay.    But do you have any specific recollection in this particular case?

A.    No.

Q.    Okay.    All right.    What specifically do you remember about this case from trial trying it?

A.    I don't remember a whole lot about it.    Some -- some -- a little bit of discussion about -- settlement discussion.    I talked to the jury -- I remember talking to the jury after the trial and some of their remarks and so forth, but, really, I don't remember a whole lot about the trial, itself.

Q.    There was a strategy discussed between you and Mr. Anderson about calling his son who could have rebutted some the victim's testimony.    Correct?

A.    Agreed, yes.

Q.    Okay.    What was his son's expected testimony to be?

A.    Of course it was our thought that the son could -- that his testimony would go along with Mr. Anderson's.

22

Q. All right. Having that information then, at least there was a concern in your mind that the defendant -- or, the victim had been convicted of this offense, do you know if you ever specifically asked the prosecutor in this case for a copy of the -- for a copy of the defendant's criminal history?

A. I do not remember one way or the other, honestly.

Q. Okay. And you worked with Billy Gant and Myles Porter for four years. Correct?

A. True.

Q. Pretty easy to work with?

A. Yeah.

Q. Did you ever feel like they were withholding anything from you?

A. No.

Q. Okay. Do you think that, at least in your experience and experience practicing in this court, if you were to tell the judge prior to -- prior to voir dire or prior to the trial starting, Judge, I've gotten all the discovery but I haven't got the criminal histories of the witnesses, do you think it would be common in the course of practicing with them that they would have then provided information to you?

A. I do -- are you asking me do I think it was

24

Q. Okay.

A. They were in the car together.

Q. They were in the car together. And, essentially, the facts of this case were, Mr. Barnett was a taxicab driver, and he alleged that Mr. Anderson, his son, and a third individual entered the vehicle, held him at gunpoint, and demanded that he drive them to Utah.

A. Right.

Q. And then they traveled for a distance and Mr. Barnett convinced Mr. Anderson that, if we turn back around, I can take you to a place and give you a car and let you go and you don't have to take me to Utah. That was the bare bones facts of it. Right?

A. Right.

Q. Okay. Did you -- did you ever consider conducting an independent search for the defendant's sex-offender registration?

A. Not that I recall.

Q. Okay. But that information was out there -- you know now that that information was out there and available to you as a defense lawyer with -- armed with the information that he may or may not be a sex offender in New York. Correct?

A. I agree the information is out there now.

25

Whether it was then or not, I honestly don't know.

MR. MOSS: All right. Pass the witness.

REDIRECT EXAMINATION

BY MR. HAYNES:

Q. All right. Well, I don't want to beat this horse too bad, but, again, when you look at the bottom of page 30, what you told the trial judge at the time was that not only did you not receive the criminal history, but you didn't receive the witness list before the jury selected.

A. Agreed.

Q. And that, surely, was your accurate recollection at the time the case was tried.

A. Yeah. I wouldn't have told the judge that if it wasn't true.

MR. HAYNES: Thank you, Mr. Jarvis.

RECROSS-EXAMINATION

BY MR. MOSS:

Q. And knew Mr. Barnett was going to testify at the trial, though. Right? You didn't need a witness list to know that he was going to be there.

A. Well, I mean, I didn't know one way or another for sure. You know, I didn't know on the day of trial they would come to -- come to some agreement or dismiss the case. You never know what's going to

26

happen until you get there.

Q.   Right.  But, I mean, if the State was going to prove that part -- this particular case -- this particular indictment with the facts involved, the essential witness -- I mean, they could not prove the case if Mr. Barnett was there (sic).  Right?

A.   I think that's right.

Q.   Okay.  All right.  Nothing further.

MR. HAYNES:  Nothing further of this witness.

THE COURT:  You may step down.  Thank you.  If you will just wait outside the courtroom for us, sir.

THE WITNESS:  No problem, Your Honor. You want this back up here?

THE COURT:  Yes, please, sir.  Thank you.

You may call your next witness, Mr. Haynes.

MR. HAYNES:  Darin Barnett.

THE COURT:  Sir, if you'll come forward and have a seat over here on the witness stand, please.  Okay.  If you will just speak into that microphone.  Go ahead and move that microphone into your mouth -- right in front of your mouth so we can hear you.

You may proceed, Mr. Haynes.

DARIN BARNETT,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HAYNES:

Q. What's your name, sir?

A. Darin Ray Barnett.

Q. And what's your date of birth?

A. 3/12/67.

Q. What town do you live in, sir?

A. Bonham.

Q. How long have you lived in Bonham?

A. A while.

Q. Can you give me any better idea than that --

A. The last --

Q. -- what year you moved here?

A. 2001. Maybe. Somewhere around there.

Q. All right. Now, you are, of course, the very same Darin Ray Barnett who is the complaining witness in the case now on trial, the State against Walter Gerald Anderson; is that correct?

A. Yes, sir.

Q. Mr. Barnett, you are the same Darin Barnett who pleaded guilty on April 13, 2000, to the offense of sexual abuse in the supreme court for Essex County,

New York; is that right?

A. I don't know. I don't know what --

Q. You don't know?

A. I don't know what I pleaded to, no. I don't know.

Q. All right.

MR. HAYNES: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Haynes) All right, Mr. Barnett, I'm going to show you a document. Look that document over.

A. Yes, sir.

Q. Does this document pertain to you?

A. It says it does, yes, sir.

Q. Does it?

A. Darin Barnett. Yes, sir.

Q. Well, I mean, you were in court when this happened. Right?

A. Right.

Q. And you got sentenced to a year in jail in New York. Right?

A. Right.

Q. So, you haven't forgotten this, Mr. Barnett, have you?

29

A. No. I just didn't know what I got convicted of.

Q. All right. But this is you; is that correct?

A. Yes, sir.

Q. And you did plead guilty in New York on the 13th of April 2000, you did receive a conviction for sexual abuse, and you were sentenced to one year in jail. Right?

A. Yes, sir.

Q. You served in jail, you remember being there. Right?

A. Yes, sir.

Q. Okay. What was the conduct that caused you -- what did you do to cause this conviction to happen?

A. I don't understand where you're going.

Q. Well, I mean, the State of New York accused you of a crime, you pleaded guilty to it, you served a jail sentence. So, tell the Court what you did that resulted in that legal proceeding taking place.

A. I don't know --

THE WITNESS: What does he want? Ma'am, I don't -- I don't understand what he wants. I mean --

THE COURT: Then just let him know if you don't understand the question.

A.    (By the Witness)  I don't understand what you want.

Q.    (By Mr. Haynes)  All right.  Well, you did something that caused you to go to court in New York, plead guilty, and take a year in jail.  Right?

A.    Right.

Q.    What was it?

A.    I don't -- I don't know what you want.

Q.    I want you to tell me what you did that caused you to spend the year in jail in New York.

A.    Wrong place at the wrong time.

Q.    Okay.  More specifically.

A.    Well, I don't know.

Q.    What place were you at?

A.    Essex County.

THE WITNESS:  I don't know what he's trying to get from me.

Q.    (By Mr. Haynes)  What was the wrong time? Why was it the wrong time?

A.    Wrong time in my life, I guess.

Q.    All right.  Who was the other person who was involved in this other than you?

A.    I don't remember her name.

Q.    Okay.  It was a woman, though.  Right?

A.    Right.

31

Q.   What did you do to her?

A.   I didn't do nothing to her.

Q.   All right.  So, they put you in jail for a year for nothing.

A.   It was a plea agreement.  I -- I don't know how to answer this.

Q.   All right.  So, your best -- the best thing you can tell the judge is, you have no idea why or what you did that caused you to be in this legal predicament you were in in the State of New York.

A.   I don't understand why you're -- I'm on trial here for something that --

Q.   Sir, you're not on trial.  You've already -- you've pleaded guilty and you've served your sentence.  No one can do anything else to you.  But I want to find out why you were in that legal pickle in New York and I want you to tell the judge what caused it.  That's all.

A.   Just wrong place, wrong time, with the wrong woman, I guess.

Q.   All right.  And you can't tell us any more than that?

A.   No.

Q.   Or you won't.

A.   I -- I just -- I don't know where you're

trying to go with it. I don't know what you want me to say.

Q. Well, I want you to say -- this is the last time I'm going to ask. Okay? I want you to say what you did with this lady that caused you to be charged with a crime to which you pled guilty for which you received a one-year jail sentence. I want you to tell the judge what you did.

A. I didn't do anything wrong.

Q. Okay. Did you ever talk to -- do you know who Donnie Jarvis is?

A. No.

Q. All right.

A. I know of him, I guess. I've seen him, but I don't know him.

Q. You talked to him in court at the trial. Right?

A. I reckon. Like I say, I don't know him.

Q. Do you remember the lawyer who represented Mr. Anderson at the trial that happened in March of 2002?

A. Just by name.

Q. All right. But you remember that Mr. Anderson did have a lawyer in court on March -- in March 2002. Right?

A.   Yes.

Q.   You testified.

A.   Yes.

Q.   The prosecutor asked you questions.  Right?

A.   Right.

Q.   Mr. -- the lawyer that represented Mr. Anderson asked you questions, also.  Right?

A.   Right.

Q.   Had you ever seen that lawyer before the trial?

A.   Yes.

Q.   Okay.  When and where?

A.   He come by my house on Oldham Road.

Q.   All right.  That's here in Bonham?

A.   Yes, sir.

Q.   When did he come by to talk to you?

A.   Before the trial.

Q.   All right.  Do you know how long before or not?

A.   No, sir.

Q.   How long did y'all spend talking?

A.   Not long.

Q.   What did he talk to you about, do you remember?

A.   He asked me about New York and I said I

didn't know what I got convicted of, and I didn't until just a while ago. I'd never really known what I got convicted of.

Q. All right. Did he ask you anything else?

A. I don't remember.

Q. You don't remember how long that you talked to him; is that right?

A. No, sir.

Q. Okay. Now, I understand you don't know exactly why you got prosecuted in New York. Do you know whether what you got prosecuted in New York for was a felony or a misdemeanor?

A. At the time, I didn't know.

Q. Now, when you've seen the document, you're reminded it's a felony.

A. Now I know.

Q. But you didn't know then?

A. No, sir.

Q. Thank you, Mr. Barnett.

MR. HAYNES: No further questions, Your Honor.

CROSS-EXAMINATION

BY MR. MOSS:

Q. Mr. Jarvis knew you had criminal trouble in New York, didn't he?

35

A.    Yes, sir.

Q.    Okay.  Did you volunteer that or did he ask you about that?

A.    He asked me about it.

Q.    Okay.  And you told him -- what do you remember telling him got you in trouble in New York?

A.    I really didn't know.  I -- he said something about New York, and I said, you know, New York.

Q.    Okay.

A.    He -- they tried to ask me questions.  I was kind of embarrassed.

Q.    What about it embarrassed you?

A.    Being charged with that, I guess.

Q.    What did you get charged with?

A.    What the guy --

Q.    Tell me -- tell me what the girl in New York said you did.

A.    I don't know.

Q.    You don't know.

A.    No.  I never saw her.  Just, it was a plea deal.  My lawyer came and that was it.

Q.    Okay.  All right.  Did you ever see an indictment?

A.    I probably did, but...

Q.    Okay.

A.   I don't know.

Q.   You know she accused you of forcing her to have sex when she didn't want to have sex with you?

A.   Yes, sir.

Q.   Okay.  All right.  So, you knew that.

A.   Yes, sir.

Q.   All right.  What do we call that when you force someone to have sex with you when they don't want to have sex with you?

A.   I don't know.

Q.   Just generally.  You've heard it on the street.  Not the formal name of the crime.  What do we call that on a day-to-day thing?

A.   I don't know.

Q.   Rape?  Does that sound right?

A.   I guess, yes.

Q.   I mean, yes?  No?  Maybe?

A.   I guess yes.  Maybe.

Q.   Okay.  And did Mr. Jarvis know that you had to register as a sex offender?

A.   I don't know.

Q.   Did you tell him you had to register as a sex offender?

A.   I don't remember.

Q.   Okay.  Do you know if it ever came up that

37

you had to register as a sex offender?

A.   I don't think it did.

Q.   Presently you have to register as a sex offender.   Correct?

A.   Yes, sir.

Q.   Correct?

A.   Yes, sir.

Q.   You have to register as a sex offender for the rest of your life?

A.   Yes, sir.

Q.   And your registration is current?

A.   Yes, sir.

Q.   You were registered as a sex offender back in 2002.

A.   I guess.

Q.   Okay.   Well, when did you move to Texas?

A.   I guess in 2001.

Q.   Okay.

A.   I got out of jail and came straight to Texas.

Q.   When you got out of jail and came -- when you came to Texas, did you know because of your conviction you had to register as a sex offender?

A.   No.

Q.   How did you find out?

From, the Bonham Police Department got ahold of me and

told me I had to come in, and that's how it all started here.

Q. He told you that you had to come in. Do you remember when that happened?

A. No.

Q. All right. Do you know if -- do you know if, now, someone goes to look you up on the computer on the internet, they'll find you registered as a sex offender?

A. Yes.

Q. Okay. At the time of the trial, could someone have looked you up on the computer?

A. I don't know.

Q. Okay.

A. I'm sure they could if they was looking for New York, I guess.

MR. MOSS: Pass the witness.

REDIRECT EXAMINATION

BY MR. HAYNES:

Q. Just a couple more questions, Mr. Barnett. Do you -- you've been asked about this before. During the trial in March of 2002, Mr. Anderson's lawyer asked you about what your problems were in New York. Right?

A. I think so.

39

Q.   And he asked you if you had been convicted of sexual assault in New York and you said you hadn't. Right?

A.   I think he asked me if I was convicted of rape and I said no.

Q.   All right.  And he asked you also if you had been convicted of sexual assault in New York and you said no to that, too.  Right?

A.   I don't remember him asking that.

Q.   All right.  Well, let me see if I can refresh your memory a little bit.  Show you right here.  It's page 48 of the trial record, and I'm looking at lines four, five, and six.  Just read that to yourself and see if that refreshes your memory any.

A.   I mean, this was years ago.

Q.   Okay.

A.   If it says I said it, I guess I said it.

Q.   All right.

A.   I don't know that.

Q.   You don't remember now.  Right?

A.   No.

Q.   But you have no reason to challenge the record.  The man asked you if you had been convicted of sexual assault in New York and you said you hadn't been.  Right?

A.   Right.

Q.   But, really, you had been.

A.   I've only have a 7th-grade education, so I didn't understand what you were going after.

Q.   Okay.  Well, but you knew when you gave that answer that you hadn't been convicted of sexual assault in New York, that that wasn't really true.

A.   No, I didn't know.

Q.   You didn't know?

A.   No.

Q.   And that's the -- that's what you're saying today, you just didn't know?

A.   I didn't know, no, sir.

Q.   And the same thing, I guess, about when he asked you if you had been convicted of a felony in New York, you said no to that, too.  Right?

A.   Right, because I didn't know.

Q.   Okay.  Thank you, Mr. Barnett.

A.   Yes, sir.

        MR. MOSS:  Nothing further, Judge.

        THE COURT:  Okay.  How old are you?

        THE WITNESS:  Forty-three, ma'am.

        THE COURT:  How far did you go in school?

        THE WITNESS:  7th grade.

        THE COURT:  Where did you go to school?

41

THE WITNESS:  Sam Rayburn.

THE COURT:  Here in Fannin County?

THE WITNESS:  Yes, ma'am.

THE COURT:  How did you get to New York?

THE WITNESS:  Drove a car.

THE COURT:  Why?

THE WITNESS:  I was married to a woman that was here that was abusive and busted my windshield out and called me 60 times at my work and the police wouldn't do anything, and I just left.

THE COURT:  So, why did you go to New York?

THE WITNESS:  Met a woman over there.

THE COURT:  Was that the same person that you got --

THE WITNESS:  No, ma'am.

THE COURT:  -- in trouble about?

THE WITNESS:  No, ma'am.

THE COURT:  Have you gotten more education since then?

THE WITNESS:  No, ma'am.

THE COURT:  Why did you not finish your schooling?

THE WITNESS:  I was raised up -- I left home when I was 12.  Went to work when I was 12.

THE COURT: Doing what?

THE WITNESS: Mowing the lawns for a guy named Johnny Terry.

THE COURT: So, where did you live?

THE WITNESS: In a barn.

THE COURT: Why didn't your parents continue to raise you?

THE WITNESS: I don't know, ma'am. I don't know. They just couldn't do it, I guess. I've got four -- five other brothers and one sister.

THE COURT: So, what -- they all got raised by your parents?

THE WITNESS: Three of them did and three of us took out on our own. My one brother, he went to the army and served in Iraq.

THE COURT: Do you have any other criminal convictions?

THE WITNESS: Felonies, no, ma'am. Little minor assaults and that was it. Pushed a guy and got convicted of that and paid a $300 fine.

THE COURT: Okay. When was that?

THE WITNESS: Six months ago.

THE COURT: Okay. Any other times where you've received probation or a fine or jail time or prison?

THE WITNESS:  I've never been to prison. I was on probation back whenever I was 19, 20 years old for a DWI, and that was it.

THE COURT:  Do you have any mental problems?

THE WITNESS:  No, ma'am.

THE COURT:  Do you have -- have you had any depression or anything like that?  Any of those type of illnesses?

THE WITNESS:  No, ma'am.

THE COURT:  Okay.  Any other questions by the State or the defense?

MR. HAYNES:  Just a couple, Your Honor.

REDIRECT EXAMINATION

BY MR. HAYNES:

Q.  Okay.  Okay, Mr. Anderson (sic), the Court went into your other legal problems and I just want to ask you about those a little bit.

A.  You mean Mr. Barnett.

Q.  I'm sorry.  Mr. Barnett.  I beg your pardon.

A.  That's okay.

Q.  So, we've already talked about the New York one.  You were prosecuted in Fannin County for DWI; is that correct?

A.  A what?  DWI?

44

Q.   Right.

A.   Yes, yes.

Q.   And they put you on probation, they filed a motion to revoke your probation --

A.   A long time ago, yeah.

Q.   -- and that motion was subsequently dismissed.

A.   Right, yes, sir.

Q.   And then -- and that was back in 1988. Right?

A.   Probably, yes.  It was a long time ago.

Q.   And then in 2004, you were prosecuted here in Fannin County for assaulting a guy named Billy Don Patterson.  Right?

A.   Correct.

Q.   And the sentence for that was -- what was that sentence, do you remember?

A.   Just a fine.

Q.   And then there was also an assault that you paid a fine for this year in May of 2010.  Right?

A.   Right.  The guy was trying to steal something off my property and I just shut my gate.

Q.   Thank you, Mr. Barnett.  No further questions.

A.   Thank you.

45

MR. MOSS: Nothing further, Judge.

THE COURT: Sir, you may step down. Thank you. If you will wait outside in the hall, please.

THE WITNESS: Yes.

MR. HAYNES: Your Honor, we will ask the Court to take judicial notice of a document in the Court's file titled Coversheet for Evidentiary Records that was filed on October 7th, 2010. You'll find there in that document -- in the jacket copies of all of the documents I just showed the defendant.

THE COURT: Any objections?

MR. MOSS: No objection, Judge. It's a certified document under seal.

MR. HAYNES: We'll call Walter Anderson.

THE COURT: Okay. Sir, you may testify from there.

THE DEFENDANT: Okay.

WALTER ANDERSON, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HAYNES:

Q. What's your name, sir?

A. Walter Gerald Anderson.

Q. You are, of course, the very same Walter

Gerald Anderson who was the defendant in this case, are you not?

A. Yes, I am.

Q. Mr. Anderson, let me direct your attention back to late 2001 and early 2002. When were you arrested on this charge?

A. June 9, 2001.

Q. All right. Were you able to post your bond?

A. No.

Q. So, you remained in jail basically since the date of your arrest in 2001. Right?

A. Yes, sir.

Q. When was Mr. Jarvis appointed to you to represent you?

A. Immediately upon arraignment, whenever -- whatever date that was.

Q. So, he had represented you, then, for eight months or so maybe, nine months before the case was tried?

A. Yes, that's correct.

Q. Did you have regular contact with him?

A. Yes, I did.

Q. You all were -- he was at his office, you were in jail; is that correct?

A. That's correct.

Q.   You could not leave the jail?

A.   I could not leave the jail.

Q.   Did he come to visit you in the jail to talk to you about the case?

A.   He did when I requested him, yes.

Q.   Between June 2001 when you were arrested and March 2002 when the case went to trial, how many meetings did you have with Mr. Jarvis?

A.   Outside of the court proceedings, two.

Q.   All right.   And in that same period of time from June 2001 until March 2002, how many times were you in court with him?

A.   Well, that's hard to say because the first trial was declared a mistrial, and then we started a second trial.   So, however many proceedings it took, I mean, to do that.   I don't know an exact amount.

Q.   Were there any pretrial hearings before the first trial that ended in a mistrial?

A.   I want to say yes, but I don't know for sure.

Q.   Okay.   How long did the first trial go before the mistrial was declared?

A.   We picked a jury, and we were in a pretrial proceeding and the bailiff marched me before the jury in chains, and that's what declared the mistrial.

Q.   That's what caused the mistrial.

A.   Right.

Q.   That was only a day -- less than a day. Right?

A.   Yes.

Q.   And how long after that did you have the trial that took place in March that actually went to a verdict?

A.   That trial lasted one day outside of picking the jury.  So, we picked the jury, and then we had a one-day trial.

Q.   Okay.  What I'm wanting to find out is how much time went by between the mistrial of the first case and the beginning of the trial that was finished.

A.   Not much.  I think we had one brief hearing to -- to solidify any pretrial motions like discovery or -- or other things, and -- and that was it.

Q.   All right.  So, how long do you figure you had spent with Mr. Jarvis before the trial began in this case on the 20th of March 2002, total?  The two meetings in the jail and all of the rest.

A.   Not long, because the proceedings, themselves, were -- were brief.  They were just to, like I say, put on record certain things, and then out the door I went.  So, as far as strategy meetings, we didn't really have much time for that.  I would say

two and that -- it wouldn't be no more than that.

Q. Can you tell me how long those meetings were? Can you give me any feel for that?

A. It's hard because I remember stressing things to Donnie Jarvis that I wanted him to do that even still didn't get done, but he seemed to know what he was doing, so I left it in his hands. I would probably say maybe an hour all total.

Q. Both meetings.

A. Combined.

Q. Total?

A. Combined, yeah.

Q. How about letters -- did you guys exchange letters?

A. Yeah -- we didn't -- all I ever wrote to him was that I needed to see him, and then I seen him before the proceeding.

Q. All right. So, you didn't send him any substantive letters about the case?

A. No.

Q. Did he send you any substantive letters about the case?

A. No.

Q. Did you guys talk on the phone?

A. No.

50

Q.   Not at all?  So, when you went to trial on the 20th of March 2002, had you received the discovery information in the case?

A.   No, I hadn't.

Q.   And, in particular, had you received any information about the prior criminal history of Darin Ray Barnett, the State's complaining witness?

A.   No, because had I received that information, I, myself, would have testified and put my criminal record up against his.  It would have been an equal playing field, you see.

Q.   Okay.  So, you had no idea of his prior criminal record?

A.   None.

Q.   As far as your attorney -- as far as you know, your attorney, Mr. Jarvis, had no idea?

A.   He had none, and I was surprised when he -- when he come up with this information for trial because we had not discussed his prior criminal history at all.

Q.   Okay.  Of course, he said in court that he didn't -- hadn't received the prior criminal history.  Right?

A.   That's true.

Q.   And you never saw it.  Right?

A.   I never seen it.

Q.   Is there anything else that you want to say to the Court or for the record about this situation about what you knew and what your attorney knew about Mr. Barnett's prior criminal history?

A.   Only that had I known he had a criminal history, I, myself, would have testified and told the jury that I did not kidnap that man.  Yes, I had a gun, but I did not kidnap him.  And Donnie Jarvis advised me against it because I had a criminal history and he didn't.

Q.   Okay.  Thank you.

MR. HAYNES:  No further questions.

CROSS-EXAMINATION

BY MR. MOSS:

Q.   What things did you stress to Mr. Jarvis that you wanted him to do?

A.   I wanted him -- in the testimony, Darin Barnett and myself, both, said before trial that he stopped for gas, and when he stopped for gas is -- is when he came back from the gas station -- from inside the gas station, he told me he had a car.  Right then we turned around and went back to the taxicab.  If Donnie Jarvis would have went to that place of business, they had video surveillance of him getting

out of the cab, going in by himself, coming back, and getting in the cab.  I don't know if they had -- they had surveillance at the pumps or not, but it would have put a definite time frame on when this happened and we could have judged how long it took him between the time of him selling me a car and actually going to the police station, because he had a cell phone in his lap and he didn't use it.  And I contested that he went somewhere else after this alleged kidnapping.

Q.  Okay.  So, basically, the facts were, you and your son and a third person -- who was the third person?

A.  Enrique Garza.  He was a friend of my son.

Q.  Enrique Garza.  Y'all get in the cab and you say, Take me to Utah.

A.  No.

Q.  Okay.

A.  No.  The boys were running away to Utah and they were in the backseat discussing it.  I said, Take me to Paris, Texas.

Q.  Okay.  Why did you have a gun?

A.  The boys had a gun.  I came to town -- my son called me on the phone and he said, Dad, I've got a gun, I'm running away from home.  I told him, Don't move.  Well, I went to town and got the gun from him,

53

unloaded it. I didn't know he had two other guns. Him and Enrique both had two other guns. So, I put the gun in my pocket, and -- the last time he ran away from home, I got -- I got reamed out by my wife because I let him run away from home. I gave him money and told him, Look -- so, this time, when he ran away from home, I said, All right, I'm going to take you to your mom; you tell her you're running away from home. This way, I don't get into trouble. She was working in Paris, Texas, at the time, which is why we needed the cab.

Q. So, Mr. Barnett's central story was, you came in, said, Take me to Utah, I gotta gun. Right? And your story was, no, that wasn't the case, it was just a misunderstanding; I never threatened him with a gun.

A. Mr. Barnett testified that I didn't do this right away. He said that I got in the cab and -- and told them that we were going to Paris, Texas. He says, Well, if we're going past Honey Grove, we need gas.

Q. Okay.

A. This is part of his statement. So, we were going to stop to get gas. When I got in the car, the gun had dug into my hip. Before we even got to the

54

gas station, I told him, Listen, I've got this gun; I'm going to set it on the floorboard, it's not even loaded, don't worry about it; I've taken it away from my son.  He said, Well, don't worry about it.

Q.   Mr. Enrique Garza testified at trial, didn't he?

A.   Yes, he did.

Q.   Okay.  And was his testimony supportive of your side of the story or supportive of Mr. Barnett's side of the story?

A.   All he testified to in reality was the fact that he didn't see me point the gun at Darin Barnett and order him to do anything.  That's basically all his testimony will reflect.

Q.   Okay.

MR. MOSS:  Nothing further.

MR. HAYNES:  That's all we have, Your Honor.  The defendant rests on the hearing.

THE COURT:  Anything from the State?

MR. MOSS:  Nothing from the State, Your Honor.

THE COURT:  Okay.  Are the attorneys prepared to make their final remarks at this time?

MR. MOSS:  Yes, Judge.

MR. HAYNES:  Yes.

THE COURT: Okay. You may proceed, Mr. Haynes.

MR. HAYNES: Your Honor, we're going to ask the Court to grant relief in this case. It's clear that the credibility of the witness Barnett is critical to the verdict that was attained in this case, and it's also clear that he deliberately misled the jury about his prior criminal record. And because Mr. Anderson's attorney didn't have the information to effectively cross-examine him, that that was allowed to stand, and if it hadn't, then we can't say beyond a reasonable doubt that the verdict would have been the same.

Mr. Anderson has a defense in this case that he was persuaded not to put on because of his prior criminal record, and if the true nature of the witness Barnett had been shown to the jury, that defense could have been put on. That's resulted in a miscarriage of justice in this case, Your Honor. I understand how hard it is to recommend that a case that's eight years old be reopened. I understand all that. But I know the Court knows that a fair and correct result is more important than the convenience of it, and we're asking, because the evidence supports it, for relief to be granted.

56

MR. MOSS: Your Honor, the State would request that the relief as stated in the motion be denied. The defendant has filed a motion for new trial based on newly discovered evidence. He has not shown that that evidence was not available at the time of trial. The defendant was on -- the defense lawyer was on notice that there was criminal history out of the state of New York. He could have investigated that. He failed to do so. He even -- he could have -- he made a motion to the Court to have the State provide that information. He could have forced the judge to have the State provide that information rather than just make a motion.

In addition, as the -- as the defendant's motion is currently presented, it is untimely and the Court doesn't -- actually lacks jurisdiction to grant his request for new trial based on newly discovered evidence because he has filed it some eight years after his conviction in this case when the Court no longer has plenary power over it.

The defendant has previously filed a writ of habeas corpus. That writ was -- alleging -- or, raising some similar grounds of ineffectiveness and actual innocence, and the Court in that -- court of criminal appeals, in that case, denied his request

without a hearing; and, as a result, the Court would request -- or, the State would request the Court to deny the defendant's motion for new trial based on those issues.

THE COURT: Your understanding of the date when that writ or habeas was raised?

MR. MOSS: I believe it was 2004, but I could be -- 2006. The relief was denied without written order by the court of criminal appeals on March 22, 2006, in Case Number WR-61,082-02.

THE COURT: Okay. Mr. Haynes, any response to the State's procedural point regarding the fact that there's been one bite at the apple, in essence, and that there would have been information about that that makes this request untimely?

MR. HAYNES: Well --

THE COURT: If taken as a writ as opposed to a motion for new trial, which is untimely.

MR. HAYNES: We've got -- we've got procedural problems in this case for sure and no one can back away from that. But the Court took this matter into an evidentiary stance in this case by treating this as a writ, and I think the evidence shows that Mr. Moss's predecessors were not as careful as they should have been about turning over the prior

criminal record of Mr. Barnett to Mr. Anderson's lawyers.  And I'm afraid it shows that Mr. Barnett was actively deceiving the Court in March 2002, and I dare to say this Court here today when he minimized over and over again what his prior criminal record in the State of New York is, and that just creates such an unlevel playing field that, in the interest of equity and fairness, we're asking the Court for relief.

THE DEFENDANT:  May I respond to --

THE COURT:  No.

MR. HAYNES:  Your Honor, I might point out to the Court that there is a federal writ pending for :06-CV-204 in the Eastern District of Texas, and what that Court did was refer the matter to the magistrate, Judge Mazzant, who placed the case -- the federal writ case on a suspended status until the defendant's -- the State remedies had been exhausted, and he's relying on that authority from the federal court directing him to exhaust the State's remedies to come before this Court today.

THE COURT:  When was -- when did that occur?

MR. HAYNES:  The case was closed on the 13th of July, 2009, and that's when this order was entered.  To get you a paper copy of it would require

me to go online and get you a copy. I could certainly do that, but not today. I can send it in the mail if the Court wants to see it.

THE COURT: Anybody have an idea of what the federal court thought was still available?

MR. HAYNES: No, I don't. We'd have to -- this is just -- I don't -- Judge, I don't know how -- I guess you're probably pretty familiar with the federal court's electronic-docketing system. They send out these little docket reports, and then a document is associated with it. In order to get the document, you have to go online and download it. That's what has all of the details in it. I've got -- if you want to see the docket text, Your Honor, I've got it here.

THE COURT: No. I trust your statement, but for them to indicate they thought there was something else that could be exhausted is --

MR. HAYNES: They don't specifically say what that is, and, you know, of course, they're not very concerned about the details of State procedure.

THE COURT: The Court's position is that -- two things. Procedurally, first this is an out-of-time motion for new trial. Out of an abundance of cause, I allowed for the attorneys to investigate

it on your behalf -- basically your attorney investigate it on your behalf, Mr. Anderson. But it's my opinion that the previous writ would have been the appropriate vehicle to raise this, and you don't get multiple bites at the apple on raising writs. So, I'm going to deny your request -- your requested relief.

So, if the attorneys would prepare an order reflecting the fact that, in my opinion, he has exhausted his writ request and then, perhaps, Mr. Anderson can use that to refer to the federal authorities to see if they have anything that they have the ability to address. But then -- at least it will be that type of ruling here; and, of course, he's got the court of appeals ruling on the previous matter.

MR. HAYNES:  Thank you, Your Honor.

MR. MOSS:  Yes, Your Honor.

THE COURT:  All right.  Gentlemen, if you'll just get an order due date and order status date.

MR. MOSS:  I will.

THE COURT:  I understand you'll be prompt about it, but we'll get a date certain where that will come in.

Mr. Anderson, I appreciate you being

61

here.  We will release the bench warrant, so you'll go back, but you'll have a copy of that order coming to you as soon as they get it.  Okay?

THE DEFENDANT:  Sure.

THE COURT:  All right.  Thank you, sir.

(End of proceedings.)

62

THE STATE OF TEXAS )

COUNTY OF FANNIN )

I, Charla Reamy, Official Court Reporter in and for the 336th District Court of Fannin County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that $279.00 is the cost for this volume of the Reporter's Record and will be paid by Fannin County;

WITNESS MY OFFICIAL HAND this the 14th day of November, A.D., 2011.

*Charla Reamy*
CHARLA REAMY, Texas CSR 6361
Expiration Date: 12-31-12
Official Court Reporter,
336th District Court
Fannin County, Texas
Bonham, Texas 75418
(903) 583-2863

Charla Reamy, CSR, TCRR
(903) 583-2863

CAUSE NO. 20118

| STATE OF TEXAS | § | IN THE 336th JUDICIAL |
|---|---|---|
| | § | |
| vs. | § | DISTRICT COURT |
| | § | |
| WALTER GERALD ANDERSON | § | FANNIN COUNTY, TEXAS |

## ORDER

After consideration of the evidence presented, and the arguments of the Defendant's motion for new trial based on newly discovered evidence is denied. Further the court finds that based on the same evidence the Defendant has exhausted all potential remedies available to him through Texas Law.

_____

Judge of the _336th Judicial Dist_

Court of _Fannin_ County, Texas

_Appendex J_
_Pg 53_

31

## IN THE COURT OF CRIMINAL APPEALS

## OF TEXAS

Cause No. 20118

Ex-Parte

WALTER G. ANDERSON

Petition for leave to file Out-of-time Petition for

Discretionary Hearing

## BRIEF STATEMENT OF THE CASE

Following a jury trial in the 336th District Court of Fannin County, Texas, petitioner was convicted of Aggravated Kidnapping and sentenced to 25 years in state prison. The 6th District Court of Appeals, Texarkana, affirmed this conviction on December 18, 2003. Writ No. 06-02-00065-Cr. Anderson v. State. No petition for discretionary review was filed due to the neglect of the appointed attorney, Donnie Jarvis, of Sherman Texas to notify his client, petitioner that the appeal had been affirmed.

The Texas Court of Criminal Appeals has stated that an Appellate Counsel has a duty to inform the defendant that (1) the Appellate Court affirmed the defendant's conviction and (2) the defendant has a right to file a pro se petition for discretionary review with the Court of Criminal Appeals, ex-parte Wilson, 956 S.W. 2d. 25, 27 (Tex. Crim. App. 1997)

1

If counsel fails to perform his duty, the appropriate relief is to allow the defendant to file an out-of-time petition for Discretionary Review. Ex-parte Jarrett, 891, S.W. 935 (Tex. Crim. App. 1995)

To assume petitioner has lain dormant all this time and not tried to gain relief from a miscarriage of justice, or wrongful conviction, or any other term that describes petitioner's situation would be in error. Upon learning of the 6th District Courts decision to affirm through the prison law library six months after the fact, petitioner's biggest concern was beating the one year limitation set by the A.D.E.P.A. The Texas law library does not provide legal advice, only books. Petitioner carried his claim of innocence through the Federal Courts and all the way to the gates of the U.S. Supreme Court as a pro-se litigant. Petitioner's claim remains barred for Procedural Infractions that were a result of a court appointed attorney who deliberately, with prejudice, failed to present trial errors that he himself preserved to the record and then tried to manipulate the system to hide his actions by not notifying petitioner that his conviction had been affirmed and that he had a right to file a P.D.R. in this court.

## PRAYER

That this court grant me leave to file an Out-of-time Petition for Discretionary Review to complete process the Federal Courts demand to overcome a Procedural Bar currently in place. Thank you.

Denied w/out written order
Aug 5th 2016

2

UNITED STATES
POSTAL SERVICE ®

P

US POSTAGE PAID
$0.00

Retail

PRIORITY MAIL ®2-Day

1006

Origin: 75851
Destination: 78711
Sep 08, 16
0 Lb 13.60 Oz
485375085+08

Expected Delivery Day: 09/08/2016          B100

USPS TRACKING NUMBER

Walter Anderson #1042654
Eastham Unit 2665 prison Rd #1
Lovelady Tx. 75851



For Domestic Use Only

PRIORITY
★ MAIL ★

UNITED STATES
POSTAL SERVICE ®

TRACKED
★ ★ ★
INSURED

Label 107R, July 2013

To Court of Criminal Appeals
Of Texas
P.6. Box 12308
Capitol Station
Austin, Tx.
78711

